

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00412-CR

THOMAS OLIVAS                                                          APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

----------

### FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 1376698R

----------

## OPINION

----------

### I. INTRODUCTION

Appellant Thomas Olivas appeals his conviction for capital murder. In three points, the appellant argues that the evidence is insufficient to support his conviction, that the trial court erred by allowing the State to introduce cell tower records, and that the trial court erred by allowing the State to introduce extraneous conduct evidence. We will affirm.

## II. OVERVIEW

This is a circumstantial evidence case expanding well over twenty volumes. In view of the length of the record and the detailed recitation necessary to review the sufficiency of the evidence, we first present a brief overview of the evidence.[1]

On March 20, 2011, at approximately 10 p.m., authorities responded to a fire at an apartment complex in Arlington where the bodies of the decedents (mother and baby) were discovered. The mother died of multiple (eleven) stab wounds. The baby suffered a violent death, the testimony showing that gasoline had been poured on or around him as he lay in a crib. The fire started in the baby's room. When the flames became visible outside, a neighbor saw a lone individual wearing a hoodie leave through a breezeway which afforded easy access to and from the decedent's apartment. Gasoline also appeared on various portions of the mother's clothing, the baby's clothing, and areas throughout the apartment.

Appellant and the mother were not strangers; they had a personal history, albeit an abhorrent one. The evidence showed appellant had a prior dating relationship with the mother, that he was the father of the baby, and that he

---

[1]Likening this case to those of Cameron Todd Willingham and Michael Morton, our eminent colleague, in her dissent, warns that that this case serves as some exemplar of a justice system gone wrong in that appellant stands convicted on nothing more than the imaginations of investigators. With respect, appellant's conviction resulted from a compelling accumulation of circumstantial evidence documented in the record. We also candidly observe both that we perceive no indication in this case that the State withheld evidence from the defense and that appellant makes no such claim.

loathed both.   Previously, the mother instituted legal proceedings against appellant regarding paternity and child support through the Attorney General's office.  After receiving legal documents from the Attorney General's office which she did not understand, she wanted to discuss them with appellant.  Although upset with mother over this legal matter and another relating to a breakup with his current girlfriend, appellant agreed.

On March 20, appellant admittedly intended to meet with the mother and was present in the area of her apartment from late afternoon to about 10:00 p.m. Cell tower records reflecting cell communications between mother and appellant, as well as appellant's later statements, showed that he drove to Arlington in the area of her apartment.  Appellant's statements and his text to mother indicated he did not know exactly where she lived.  About 7:00 p.m., mother texted appellant that she would give him directions as soon as she got to her apartment. A few minutes later, the mother did call appellant, ostensibly to give appellant the promised directions to her apartment.  It is patently unreasonable to entertain any other explanation for her call.

Statements by appellant and testimony of several witnesses confirmed that the vehicle appellant borrowed and drove on the night of the murders and days afterwards smelled of gasoline.  In addition, on the night of the murders, appellant alerted the vehicle's owner that he had spilled gasoline in her vehicle.

The dissent emphasizes that neither decedent showed evidence of smoke inhalation and therefore neither was killed by the fire yet stresses that the

3

majority inexplicably concentrates on the gasoline. Common sense dictates we recognize gasoline as a critical connector, the signature element which ties appellant to the murder scene.

It is undisputed that gasoline was the accelerant which started the fire in the apartment. It is also undisputed that appellant admitted gasoline was in the vehicle he drove on the night he intended to meet mother, the same night of the murders. Many witnesses smelled gasoline in the vehicle shortly after the murders. This distinctive, lingering gasoline odor apparently weighed so heavily on appellant's mind that he broached the subject in a conversation with the owner of the vehicle to preempt suspicions and furnish a reason to explain it away.

Thus, gasoline constituted key, unique evidence connecting appellant to mother's apartment and to the murders of the mother and baby. Gasoline served another purpose: it accelerated the fire in the apartment, eviscerating considerable evidence, be it DNA, fingerprints, or other vital evidence.

It is a reasonable deduction from this evidence that appellant drove to Arlington on March 20 to meet with mother as planned and agreed, received directions to the apartment from mother, and drove to her apartment in a vehicle containing gasoline and that thereafter, appellant fatally attacked both mother and baby, set the apartment ablaze with gasoline as the accelerant, and left the murder scene.

4

### III. BACKGROUND

The Arlington Fire Department received a 9-1-1 call on Sunday, March 20, 2011, just after 10:00 p.m. pertaining to a fire at the Presidents Corner Apartments in Arlington, Texas. Firefighters responded, and within minutes they pulled a lifeless, adult female from an apartment and unsuccessfully performed CPR on her. Firefighters soon determined that the adult female, later revealed to be Mechelle Gandy, had been stabbed, so the Fire Department notified the Arlington Police. Because nearby witnesses said that there was an infant known to live in the apartment, firefighters continued to search for the infant as they extinguished the fire. More than four hours later, firefighters found the charred remains of an infant boy, later determined to be Asher Olivas, under a layer of debris on the burned springs of the mattress of a baby bed. Fire investigators determined that the fire had been purposely set and that gasoline had been used as an accelerant.

#### *The Police Interview the Appellant*

The following day, after officers followed the appellant from his job at Best Buy to his apartment in Grapevine, appellant agreed to speak with police at the Grapevine Police Department. During his interview with officers, and after he consented to the search of his apartment, appellant said to officers, "Please tell me my son's fine." When officers informed appellant that they had found the mother's deceased body in the fire, he responded, "No. . . . I was supposed to go see her last night." Regarding his relationship with the mother and baby,

5

appellant explained that when he had cheated on his long-term girlfriend, Rebeca Raudry, he had gotten the mother pregnant. Appellant said that he had told Raudry that the baby was not his son. Appellant initially described his relationship with the mother as "a one night stand," but later he said that they had had sex several times. Appellant said that he knew that the mother was seeking child support and that he was ready to "do it" but that he was waiting to be served papers.

Appellant said that the mother had already been served papers in regards to a child-support suit that she had initiated with the Attorney General and that she didn't understand them. Appellant said that he did not know where the mother lived and that, ostensibly, on the night of the murders, he was "just dilly dallying" around in a borrowed vehicle waiting to find out where the mother lived so he could "get it over with."

Regarding the vehicle he was driving the night of the murders, appellant said that a friend, Amanda Rowe, had lent him her greenish Ford Explorer for the weekend. He said numerous times that the Explorer smelled like it was "leaking gas" or that it smelled of "gas" but that he did not know why it smelled that way. When asked specifically whether he had a gas can in the vehicle, the appellant said no. Initially, appellant did not consent to a search of the Explorer, but later he did.

The appellant explained to police that he had recently broken up with Raudry because the mother had been emailing Raudry and saying that she and

appellant were a couple. Appellant said that it was a bad breakup and that Raudry had left with their daughter and his stepson the previous Wednesday. According to appellant, he had thrown Raudry's phone in anger over the breakup but that other than that, he had not gotten physically abusive with Raudry. Appellant said that the breakup caused him to be depressed and nearly suicidal, so he called some friends who lived in Houston and Austin, and that they came to see him Friday night. Appellant said that he even took some pills but then "spit 'em out." By his account, appellant's friends left Sunday morning—the day of the murders.

Appellant said that he spent Sunday afternoon and evening at Volcano's, a pool hall in Hurst. Appellant said that he was at Volcano's from "2ish, 2:30ish" p.m. to "7, 8 o'clock" p.m. playing Golden Tee, a video golf game. He said later in the interview that he left Volcano's at "8:30, 9 o'clock". Appellant said that while he was at Volcano's, the mother texted him that she was in Grapevine and that she was going to his apartment. Appellant said that the mother was "going off" about needing to talk to him about child support paperwork.

Appellant said that he had agreed to pay child support and that other than that, he did not want the mother in his life. When asked about the baby's birthday and whether the mother had informed him of the birthday, appellant said "I won't lie, I don't know." He said that he agreed the baby was his child from the moment the mother told him that she was pregnant and that he had asked her to

7

get an abortion. Appellant said that when the baby was born, the mother gave the baby the last name of Olivas and that he did not approve.

Appellant said that he was "very, very sad" that the mother had initiated proceedings to collect child support because he knew that it meant the end of his relationship with Raudry. But appellant said that he was not angry about it. He said that it was his understanding that he was to have a meeting with a lawyer and the mother regarding child support, but he stated that the mother had cancelled multiple times. Appellant said that even though the mother had cancelled, he received a letter that "made it seem that [he] never went" to the scheduled meetings.

Even though appellant had initially said that the mother texted him first on Sunday, he then said that he texted the mother because she had called him multiple times throughout the weekend but that because he was with friends, he did not respond. Appellant said that he and the mother texted about her wanting him to look at the paperwork as he was getting ready to leave Volcano's. Appellant said that the mother had texted him that she lived "off Lamar" in Arlington but that he did not know specifically where she lived. Appellant said that he agreed to come to the mother's place; but he stated that she never informed him of where she lived, that he called her and she did not answer, and that he just drove "up and down Lamar street." Appellant said that he then drove to a nearby pool hall, smoked some cigarettes, and just sat at the bar by himself. Appellant could not remember the name of the pool hall, but he repeatedly said

8

that he would find out its name. He never did. He did say that it was near a "Mexican Chinese convenience store." Appellant said that the latest he stayed in Arlington was 9:30 p.m. He said that at "tops" he was in Arlington for one and one-half hours. Appellant said that he texted the mother with a message stating, "can't see you no car." Appellant said that what he meant by the text was that he was in a borrowed vehicle and had to return it. Appellant then changed his timeframe and said it was "10 o'clockish" when he left Arlington and that he proceeded straight to his apartment from there.

Appellant said that he learned of the mother's death in the news. When told that the mother's and baby's deaths were considered a homicide and that investigators believed that the fire was purposely started in the aftermath, appellant responded, "Wow."

During the interview, appellant gave officers permission to search his cellphone. He also initially gave permission for the officers to photograph his body. When asked whether he had any injuries, appellant said that he had "scratches from myself." He then said that he was uncomfortable taking off his shirt. When asked why he was not comfortable taking his shirt off, appellant said he "would prefer to consent with someone over that." He then said that he had eczema and that he scratched a lot. Appellant said that he had always had eczema and that it was "such a bad thing." He said that at times, Raudry would have to wake him up and tell him to stop scratching because he would scratch in his sleep. Appellant said that he would scratch so much that he often would

9

"leave welts, large welts." He told the officers to ask Raudry about his eczema. Appellant went as far as to say that he wore "hoodies or jackets" even in the summer so that he would not scratch and that he would not even take his shirt off when at a swimming pool.

Appellant did eventually let an officer photograph his body. When he removed his shirt, it was evident that appellant had numerous scratches on his torso. Appellant said that they were all self-inflicted because of his scratching related to his eczema. He also began to scratch when his shirt was off, and he gave the explanation that he only scratched when his shirt was off. Appellant even offered that the officers had not seen him scratch until that moment.

Later, after appellant was arrested and charged with capital murder, the police interviewed him again. Much like in his first interview with police, the appellant said that he had never been to the mother's apartment and that he was in Arlington on the night of the murders because he was attempting to meet with the mother regarding paperwork relating to his paternity of the baby. He said that the mother had never given him directions to her apartment but that he knew the general area where she had said her apartments were. According to appellant, this is how he knew to take the highway exit to Arlington that was close to the mother's apartments. Appellant again said that when he arrived in Arlington that night, he drove around.

Appellant said that he was the only person who had his phone on the night of the murders. He also said that the mother did not want him to know where she

lived, but he did say that the two once had sex in a car at a park probably a mile from her apartment. Initially, appellant said that he did not remember telling officers in his first interview that the Ford Explorer smelled like gasoline. But then later in the interview, appellant said that he "vaguely" remembered talking about the vehicle smelling like gasoline. He also said that he remembered saying something to Rowe about the Explorer smelling like gasoline but that "she didn't say anything about i[t]." But then appellant said that he asked Rowe whether the vehicle was leaking gasoline and that she said she did not know why it would smell like gasoline.

### Paul Isaac D. Lopez

Paul Isaac D. Lopez testified at trial that he was living in the apartment next door to the mother in March 2011. According to Isaac, on the night of the fire, he was outside grilling fajitas when he saw a person walk out of the breezeway near the mother's apartment. Isaac reported to the police that the person was wearing a "hoodie" and that the person was taller and "beefier" than he was. By Isaac's account, the breezeway was near a broken gate that would have allowed easy access to the mother's backyard and apartment. Using an exhibit, Isaac described to the jury where he was standing that night, where the mother's apartment was, and where he saw the person with the hoodie walk out from. Isaac said that the person would have had to have been in the mother's apartment or backyard from sometime before 9:15 p.m. that night, when Isaac

11

began to grill, until roughly 10:00 p.m, when he saw the person in the hoodie leaving the breezeway.

Isaac averred that a few minutes after seeing this person, he saw flames coming "from the baby's room" of the mother's apartment. Isaac said that he yelled for his girlfriend[2] to call 9-1-1 and that he proceeded to pound on the mother's door and yelled, "Anybody in there?" Isaac said that the window adjacent to the door was extremely hot. Even so, Isaac said that he kicked in the door and that smoke came "gushing out," covering his face. Isaac said that the level of smoke caused him to choke and that he could not proceed into the apartment and could not see nor hear anyone inside. By Isaac's account, shortly after he kicked in the door, firefighters arrived and pulled out the mother's body from the apartment—he said that she was wearing only her panties. Isaac said that emergency personnel attempted to revive the mother but were unable to. Isaac said that he and his girlfriend pleaded with firefighters: "Did y'all find the baby?" Isaac said that it was not until later that he learned that the baby had also died.

### Celia Lopez

Celia Lopez, Isaac Lopez's girlfriend at the time of the fire, testified that although she lived at a different location, she mainly stayed at Isaac's apartment during March 2011. Celia said that she had met the mother a few times and knew her to live in the next-door apartment. She also knew the baby. Celia

---

[2]By the time of trial, Isaac had married his girlfriend.

described the mother as a friendly neighbor. Celia recalled how on the night of the fire, Isaac had come into his apartment and asked her whether she could smell something burning. Celia said that as the couple pulled the blinds away from the window closest to the mother's apartment, the two could see "gulfs of flames" inside of the baby's bedroom. Like Isaac, Celia said that she assumed the mother and baby were home because the mother's car was parked at the apartments.

By Celia's account, she called 9-1-1. A copy of the call she made was admitted and played for the jury. She said that as she was speaking to the operator, Isaac kicked in the door to the mother's apartment. Celia said that "massive flames" then shot out of the apartment. Celia also said that while she was on the phone, like Isaac, she was running around and pounding on doors, warning their neighbors of the fire.

Celia recalled that after firefighters arrived, she saw them bring out the mother's unconscious body. Celia described the mother as having "no clothes on." Celia said that she was still there when responders declared the mother deceased. Celia said that she repeatedly told firefighters that the baby was probably inside: "I told everyone that came out [of the apartment] that there was a baby, because they couldn't tell me where the baby was." Celia testified that at some point, she learned that the baby had died in the fire.

### *Jason Michael Arias*

Jason Michael Arias of the Arlington Fire Department said that he and his crew were dispatched to Presidents Corner Apartments at 10:11 p.m.  Arias said that as he drove the fire truck to the apartments, he could see a column of smoke emitting from the complex.  Arias said that as firefighters approached the door of the mother's apartment, thick, black smoke billowed out.  By Arias's account, shortly after firefighters entered the apartment, the mother's body was discovered and taken out of the apartment.  Arias described the mother as "not clothed" and unresponsive, and he said that he noticed blood, which he "did not expect." Arias said that he and another firefighter passed the mother's body to other responders, and that he and others continued further into the apartment.  Arias averred that there was "zero visibility" and that he and his crew required air masks in order to breathe.

According to Arias, he did not begin to encounter fire until he made his way toward the baby's bedroom, where the door to the bedroom had already completely burned away.  Arias said that it took firefighters a few minutes and multiple hoses to extinguish the fire they found.  Arias said that there were no identifiable structures remaining in the bedroom and that, given the fire pattern, the fire originated in the baby's bedroom.  Through the use of a diagram, Arias described to the jury the areas of the mother's apartment and the conditions in which they were found.

### Robert Daniel Kornegay

Arlington Fire Department firefighter Robert Daniel Kornegay testified that as he and Arias approached the apartment, numerous neighbors expressed concern over the mother and baby. Much like Arias's account, Kornegay explained how as firefighters entered the apartment, the bulk of the fire emanated from the baby's bedroom. Kornegay described the baby's bedroom as being engulfed in "flames from the ceiling to the floor, wall to wall." He said that "[i]t was almost like daylight there was so much fire." Kornegay said that he maneuvered outside, broke a back window to the bedroom, and aimed a hose toward the fire from that position in order to have a second source of water competing against the fire. Kornegay said that the firefighters' focus was on the back bedroom for two reasons—because that was the main source of the fire and reports were that a baby was in that room.

### Lester Warren Hicks

Lester Hicks testified that he was the mother's stepfather. According to Hicks, the mother was working at a local 7-Eleven during March 2011. Hicks said that he knew that the name of the baby's father was that of the appellant and that he had met him. He also said that there was friction between himself and the mother at the time of the baby's birth because he felt that the appellant should be helping financially but was not. Hicks averred that he urged the mother to "file the proper paperwork to get support from [the appellant]."

15

Hicks said that the first time he met the appellant, the encounter was "pleasant." Hicks averred, however, that his later encounters with the appellant soured because he felt that the appellant was disrespectful toward the mother.

### Corporal Jamon Mathews

Arlington Police Department Corporal Jamon Mathews testified that he was dispatched to the scene of the fire after firefighters discovered the mother's body. Mathews said that the state of the mother's body was "very unusual" for a body being found during a fire because rather than being burned, it appeared as though she had been stabbed. By Mathews's account, the appellant's name came up during his initial investigation into finding where the baby may have been during the fire. Mathews said that his investigation revealed that the appellant was the baby's father. He also said that he contacted a woman named Rebeca Raudry, whom he had been informed was the appellant's girlfriend. According to Mathews, Raudry became hysterical and afraid when he asked the appellant's whereabouts, so much so that Mathews radioed for officers to go meet with her. Mathews said that he stayed on the line with Raudry until other officers got there.

### Craig Johnson

Retired Grapevine Police Officer Craig Johnson testified that he responded to Mathews's welfare check on Raudry, appellant's former girlfriend, at roughly 7:15 a.m. on March 21, 2011. Johnson said that Raudry, who was living with her father at the time due to her recent breakup with the appellant, was "hysterical,"

16

"visibly shaken," and "scared for herself and . . . her two small children." Johnson explained Raudry's emotional state:

> She was just out of a relationship with a person who may or may not have been involved in a homicide of a girl – of [the appellant]'s current girlfriend and that small child and she was scared because she had two small children and she lived very close to [appellant], so as an officer, yes, I would believe that she had grounds to be scared.

Johnson said that while there, Raudry requested that they perform a welfare check on the appellant at the couple's former address. According to Johnson, Raudry told him that she and the appellant had recently broken up and that the appellant was staying at their old address. Raudry gave Johnson her key to that apartment and consented to allow police to search there. Johnson said that when he got to the apartment and after knocking, he and other officers let themselves in using the key. Johnson described how it was apparent that someone had recently disrobed and showered because there were clothes on a chair and water inside the shower. He also averred that the apartment seemed orderly. Johnson said that he reported what he had found and then secured the scene while another officer sought a search warrant for the apartment.

### Shannon Fallentine

Crime scene investigator Shannon Fallentine of the Arlington Police Department testified that she photographed the mother's body after medical personnel had declared her deceased. Fallentine said that she noted that the mother had several "stab and/or incise wounds mainly on the torso." Specifically, Fallentine said that she noted two apparent stab wounds to the mother's right

breast and multiple incise wounds on her back and right side. Fallentine also documented multiple scratches, lacerations, and abrasions on the mother's torso.

According to Fallentine, at the time she photographed the mother's body, the baby had still not been found. From there, Fallentine said that she collaborated with fire investigators as she photographically documented the inside of the remains of the apartment. Pictures of the scene that Fallentine took were admitted and published to the jury. Fallentine also described the scene:

> The interior was very dark, very charred, evidence of extreme heat and fire damage. Just inside the doorway to the apartment, there was a great deal of apparent blood noted on the floor of the kitchen. The intensity of the burn patterns, in my opinion, seemed to increase as I worked my way from the front door into the residence, into the two bedrooms of the apartment, specifically the bedroom indicated to belong to the infant child.

Fallentine indicated that the highest degree of fire damage was found in the baby's bedroom. She also described the level of blood found in the kitchen as "significant."

Fallentine said that after she finished photographing the scene, fire investigators began to search the baby's room. By Fallentine's account, fire investigators found the baby at this time:

> [The baby's body] was located in the southeast corner of the bedroom on top of a metal set of springs around the same size of an infant bed. However, all the mattress had burned away, and on the springs, he was located, I believe, under eight to nine inches of Sheetrock.

Among many items collected, Fallentine said that she gathered blood swabs from pooled blood found in the kitchen and hallway as well as any conductive surfaces

18

that could possibly have DNA or fingerprint evidence on them. She also found and collected a cellphone that belonged to the mother. According to Fallentine, she documented "pry marks" on the back door, which indicated to her that at some time the back door of the mother's apartment had been pried open. Fallentine averred that the pry marks could have even been left by firefighters. She also testified that the front door's deadbolt was engaged at the time the door was kicked in and that the deadbolt could only have been engaged from the inside of the apartment.

### Amanda Rowe

Amanda Rowe testified that she was living in Arlington, Texas, during March 2011. By Rowe's account, she was married but separated at the time. She said that she and the appellant developed a friendship that she described as "commiserating friends," and although she admitted that the two had been physically intimate, she agreed that it was not a "dating" relationship. According to Rowe, the appellant and she had in common that they were both going through breakups: she with her then husband and the appellant with Raudry.

Rowe said that she was on vacation with her children a few days before the fire when the appellant called her. Rowe said that during the call, the appellant informed her that he no longer had a working vehicle and was concerned how he would be able to get to his jobs. By Rowe's account, the appellant said that he had loaned his car to a friend who had wrecked it and that his insurance would not pay for the damage caused by another driver. She also

19

averred that during this conversation, the appellant proclaimed his love for her and a desire to move away with her to Virginia. Rowe said that this surprised her and stated that she promptly changed the subject.

Rowe said that she then arranged for the appellant to get a key to her vehicle, a green Ford Explorer, so that he could use it while she was away on vacation. Rowe recalled that she received a call at 11:36 p.m.[3] on the night of the murders from the appellant, who was attempting to return her vehicle to her so that she would have it when she returned from vacation. Rowe said that the appellant told her that she "was going to be very mad at him because [her] car smelled like gasoline." Rowe said that the appellant told her that he and a friend had been mowing a yard and gas spilled in the vehicle. Rowe told the appellant to leave the windows open for ventilation, hoping the smell would dissipate. By Rowe's account, her vehicle had never smelled like gasoline prior to her loaning it to the appellant.

Rowe said that she did not hear from the appellant for a few days and that he did not return her vehicle as planned. In the interim, Rowe said that police had contacted her about appellant's use of her vehicle on the night of the murders and that they had her vehicle. Rowe said that when she finally did get her vehicle back weeks later, "it did smell like gasoline, quite strongly." Rowe

---

[3]Rowe testified that she received the call at 12:36 a.m. on March 21, 2011, but because of the time difference, the call would have been 11:36 p.m. Central Standard Time.

20

said that she had to have it cleaned multiple times and that the smell finally dissipated.

According to Rowe, several months after the fire and murders, and after she had moved to Virginia, the appellant unexpectedly visited her in Virginia. Rowe said that she didn't know exactly why the appellant was in Virginia other than she suspected he had come for a video game tournament. Rowe recalled that the appellant told her then that at the time of the murders, he was in Arlington and that he was connected to the victims because the mother had claimed that he was the father of the baby. Rowe said that the appellant told her that he and the mother had planned to have a paternity test taken but that efforts had fallen through. Rowe said that the appellant had never informed her that he was attempting to contact the mother on the night of the murders.

### *Layne Shinpaugh*

Detective Layne Shinpaugh, a fugitive officer of the Arlington Police Department and a United States Marshal, testified at trial. Shinpaugh said that he and a fellow officer located the appellant as he was working at Best Buy on March 21, 2011. After the appellant left for the day, Shinpaugh and his fellow officer followed the appellant to his apartment. According to Shinpaugh, other officers were already at the appellant's apartment. The appellant was driving a green Ford Explorer. After the appellant exited the vehicle, Shinpaugh and other officers made contact with him. Shinpaugh said that the appellant was cooperative and that the two sat in Shinpaugh's vehicle and talked. After ten or

21

fifteen minutes, the appellant left with other officers to go to the police station to conduct an interview.

Shinpaugh said that he stayed and participated in a search of the appellant's apartment. After that, Shinpaugh said that as he was leaving, he approached the Ford Explorer that the appellant had been driving and noted that the windows were down "approximately three, four inches." Shinpaugh also noticed "a smell of gasoline . . . emitting from" the vehicle.

### Adam Smith

Detective and United States Marshal Adam Smith of the Arlington Police Department testified that he was working with Shinpaugh as a fugitive officer during this investigation. Like Shinpaugh, Smith also tracked the appellant from Best Buy to his apartment. Smith averred that the appellant was driving a green Ford Explorer. Smith also said that he found it odd that the appellant had parked the vehicle so far away from his apartment, "approximately 80 yards away . . . which . . . was odd because there were several other parking spaces in between that." Smith said that after the appellant left for the police station, he also took a closer look at the vehicle. Much like Shinpaugh, Smith also noted that the windows were partially down and that a smell of gasoline was emitting from the vehicle's interior.

### Rebeca Raudry

Rebeca Raudry testified that she and the appellant had previously dated, beginning in August 2006, and that they had a child together. Raudry averred

that she had never known the appellant to suffer from eczema or any type of skin condition and that she had never seen him break out in red welts. Raudry said that she had never known the appellant to scratch during his sleep and that she had never known him to scratch until he would bleed. Raudry also said that she knew the appellant to take his shirt off whenever they would be at a pool, that he wore short-sleeved shirts during the summer, and that he also often wore shorts. By Raudry's account, the appellant did like to wear hoodies. Raudry testified that she and the appellant never had rodent problems at any place that they had lived together and that the appellant had never expressed the desire to obtain a gun for controlling any problem of the type.

When asked about the mother, Raudry said that she first learned of the mother when she saw text messages from the mother to the appellant on the appellant's phone. Raudry averred that seeing the texts prompted her to call the mother. Raudry learned from the mother that the mother and the appellant had an on-and-off sexual relationship that overlapped with Raudry's relationship with appellant. Raudry said that after talking with the mother, she asked appellant whether the baby was his. The appellant denied paternity. Raudry said that even though the appellant denied paternity, the appellant received an invitation to the baby's first birthday party. The State introduced the invitation into evidence. The invitation had been sent to the home of Raudry's father, where she and the appellant had once lived. According to Raudry, when she confronted the appellant with the invitation, he declared, "I don't want to f_____ look at that."

23

Raudry averred that the appellant then said, "That f_____ baby is the devil's child." Raudry said that the appellant also often referred to the mother as a "bulldog."

Raudry said that the appellant received a letter from the Attorney General regarding the mother's claim that he was the baby's father. Raudry averred that the letter included dates that the appellant had failed to appear for paternity tests and that when she pressed the appellant to go forward and get tested, he said that he would "get it done."

Raudry recalled how that on March 15, 2011, the appellant called her from work and said, "She's here." Raudry said that the appellant was very angry by the mother's having shown up at his work. When Raudry went to pick the appellant up, he allegedly said, "That b____ is here. She won't leave us alone. I f_____ hate her." Raudry averred that the appellant had blocked the mother's texts and calls on Raudry's phone. Raudry said that she became convinced that the appellant was lying about his paternity and the extent of his relationship with the mother when the mother sent her a picture of the appellant's penis, taken in Raudry's bathroom. Raudry testified that the mother also forwarded text messages between her and the appellant. When Raudry confronted him the next day with this information, the appellant claimed that the mother had hacked into his and Raudry's phones. Raudry said that she found this explanation "ridiculous;" that the couple got into an argument; and that the appellant "kicked

[her] and the kids out." Raudry said that as she left, the appellant grabbed her cellphone from her and threw it into the street.

Raudry said that on the day of the murders, she was in contact with the mother and that the mother relayed to her that the appellant was texting the mother that evening. Raudry said that after the fire and murders, the appellant told her that he had tried to kill himself. Raudry averred that the appellant had said that he had taken pills but that a friend prevented his suicide attempt by making him throw up what he had taken.

Raudry said that several months after the murders, she, the appellant, and their daughter went swimming and that the appellant took his shirt off. She said he showed no signs of a skin disorder. Raudry also admitted that she began having a sexual relationship with the appellant again. Raudry averred that it would have been difficult for the appellant to financially support the baby in any way because even with two jobs, she, the appellant, and her two kids "were barely making it." Raudry said that the appellant had even said that he would not be able to afford it. Specifically, Raudry recalled that he had said, "How the hell am I supposed to pay for another child?" Raudry said that it was her understanding that the night of the fire and murders, the appellant was supposed to meet up with the mother to discuss paternity paperwork.

### Richard Armistead

Richard Armistead testified that he formerly worked with the appellant for about three years at a restaurant. By Armistead's account, in the months leading

25

up to the murders, the appellant had changed. According to Armistead, "I could tell he wasn't happy with where he was at and things weren't going well for him, so he was distancing himself." Armistead said that he also knew Raudry. Armistead recalled how the appellant had told him about how "a girl had come into the restaurant, goes into the bar, ranting and raving that [the appellant] was the father of her child and that he needed to pay child support." Armistead said that the appellant began to miss work around the time of the murders, and that because of this, he reached out to the appellant. By Armistead's account, on March 21, 2011, the appellant asked that Armistead come see him at his apartment but the appellant warned him, "Well, just to warn you, there's police at my apartment, outside." The appellant told Armistead that he had been accused of murder.

Armistead said that he purchased some beer and headed over to the appellant's apartment. Appellant explained to Armistead how a woman who alleged that the appellant was the father of her baby had been murdered along with the baby. Armistead recalled that the appellant claimed he had never had sex with the woman. Armistead said that the appellant said that he was in the area where the murders had happened, "at a friend's house." When Armistead inquired whether the appellant had told the police whose house he was at, the appellant allegedly said "no". This struck Armistead as strange.

Armistead also averred that he had once been on a boat party with the appellant and Raudry, that everyone was wearing swimsuits and T-shirts, and

that the appellant never complained of eczema. Armistead further said that when he and the appellant would hang out outside of work, the appellant would wear short-sleeved shirts, and Armistead said he never saw any welts.

### Timothy Ryan Jopson

Timothy Jopson testified that he knew the mother from having lived near each other over the years. He also knew the mother because she worked at the local convenience store near him. Even though they were friends, Jopson said that he had previously had oral sex with the mother. He also recalled having gone to her apartment once and that while he was outside, he saw a man leaving her apartment. Jopson described the man,

> Medium build, short hair, dark hair. There was a light race, maybe not, but most likely Hispanic or mixed, lighter tone than my tone maybe, but a little lighter. And it was, I think, midnight or so, late that night.

Jopson said that he received a call late on March 20, 2011, from the police, which he returned. By Jopson's account, he was out of state at the time of the murders and the call but returned the following Monday and had a conversation with a detective at the Arlington Police Department. The State introduced cell tower data that corroborated Jopson's whereabouts at the time of the murders. The data demonstrated that Jopson's cellphone was communicating from a location in Moore, Oklahoma.

### Stephen Lea

The Fire Marshal for the City of Arlington, Stephen Lea, testified that he responded to the fire after learning that the fire involved a victim. Lea said that

27

he responded at 10:45 p.m. Like other firefighters, Lea averred that the fire began in the baby's bedroom. He also said that the bedroom's door had been closed as the fire emerged and that the bedroom reached a point of "flashover," which meant that everything within the room ignited practically at the same time. Lea testified that he found the baby's remains under debris in the baby's bedroom.

By Lea's account, the bedframe of the baby's bed had been completely consumed by fire and the baby's remains were on top of the springs. Lea indicated that the baby was "unburned on the mattress side" of the bed, which indicated that the heat and fire came from the front and top of the bed and not from underneath. Because of the damage to the room, Lea said that there were no visible signs of a liquid accelerant having been used; thus, he took samples for testing, including a sample from the area where the baby's remains were found. Lea averred that testing indicated that gasoline had been used as an accelerant.

Lea also said that despite multiple searches, the remains of a smoke detector were never found in the mother's apartment, even though the apartment was wired for one. He also said that his investigation revealed that other apartments within the same complex had smoke detectors. Lea further averred that an "accelerant dog" was used to look for signs of an accelerant. The dog alerted in the areas of the baby's bed, the doorjamb of the master bedroom, and the living room near the couch and coffee table.

Lea also processed the Ford Explorer after police impounded it. According to Lea, upon opening the door to the Explorer, he immediately smelled gasoline. Lea said that the smell of gasoline was strongest near the rear, in the cargo compartment. He also said that there was an indication of "a spill" in that area. Lea collected samples from inside the vehicle, but initial testing of these samples did not test positive for gasoline. Lea said he did not seek additional testing and was not surprised by the test results, but it was his firm belief that he smelled gasoline in the Explorer. Lea testified that prior to him testifying, he reopened the sealed exhibits containing the samples taken from the Ford Explorer. Lea said that the samples still "smelled like gasoline."

### Emerald Nazareno

Emerald Nazareno, a forensic scientist for the State of Texas Fire Marshal's Forensic Arson Laboratory, testified that he processed the samples taken from the mother's apartment and the Ford Explorer. According to Nazareno, the samples taken from the baby's room, the master bedroom, and the living room all tested positive for gasoline. The sample from the Ford Explorer tested negative for any accelerant. When asked why the sample that tested negative would still smell of gasoline three years later, Nazareno explained that traces of gasoline could go undetected by testing but still be present enough to smell if the traces were within a sealed bag, which the Ford Explorer samples were.

Items taken from the appellant's apartment tested negative for accelerants. Nazareno averred, however, that those items could all have tested negative due to how the samples were packaged. Nazareno explained that the samples taken from the mother's apartment had been packaged in tightly sealed canisters, whereas the samples from the appellant's apartment and from the Ford Explorer had initially been packaged in bags. Specifically, Nazareno stated that the lab expected those items to test negative because they "expect any ignitable that would possibly be there to leave because of the packaging." Nazareno went on to aver that crime investigators who are accustomed to placing evidence into bags, as opposed to sealed cans, generally do not "know how to collect for arson."

### *Kelly Belcher*

Kelly Belcher, who worked for the Tarrant County Medical Examiner's Office in the trace evidence laboratory when this case was being investigated, testified that she performed trace examinations on the mother's and baby's remains. Belcher said that as she examined the mother's body, she noticed the smell of gasoline on the shorts the mother was wearing.[4] She also noted multiple stab wounds to the mother's right shoulder and back. Belcher testified that she collected a potential hair from the mother's right shoulder and an actual hair from her perianal area. She also collected a hair mass from the mother's left hip and

---

[4]Some of the witnesses testified that the mother was wearing panties and other witnesses testified that she was wearing white shorts.

multiple hairs from her buttocks. Belcher testified that she performed fingernail cuttings on the mother's body and that she collected trace materials from her torso.

### *Daniel Wade Easley*

Senior Officer Daniel Wade Easley of the City of Grapevine Police Department testified that he was a detective in the criminal investigations unit when he was called to investigate the appellant's location at 8:30 a.m. on March 21, 2011. Easley said that he proceeded to the appellant's apartment, where he waited until the appellant arrived that afternoon. By Easley's account, the appellant was driving a green Ford Explorer and parked it in an apartment complex adjacent to that of appellant. Specifically, Easley said that "there were several parking spaces that were vacant between where he parked and the location of his apartment." Easley said that he made contact with the appellant after he had exited the Ford Explorer and that he talked with him until Arlington detectives arrived to speak with him.

Easley said that as he was speaking with the appellant, the appellant said, "Can we go inside before my neighbors think I killed Rebeca and my daughter[?]" Easley said this struck him as odd because he had not discussed any specific charges or events with the appellant. Easley averred that the appellant later said that he would not have made this statement had he known the nature of why Easley had approached him.

31

Easley said that the appellant voluntarily agreed to go to the police station. He described the appellant as "very cooperative." While at the station, the appellant signed a series of consent forms, in conjunction with granting consent for officers to search his apartment, the Ford Explorer, his cellphone, and his person—including taking buccal swabs of his skin and mouth, and taking pictures of his body and clothing. Easley said that he photographed the appellant's body. These pictures were introduced into evidence and published to the jury.

### Patricia Eddings

Patricia Eddings testified that she worked for the Tarrant County Medical Examiner's Office crime lab during the time the mother's and baby's remains were processed. Eddings testified that the hairs recovered from the mother's body generally exhibited traits similar to the mother's hair but that they did not exhibit traits similar to the appellant. Two of the hairs, however, did exhibit "some dissimilarities" to the mother's and "might have come from someone else." Those two hairs, according to Eddings, did not display "any similarities" to the appellant. Eddings also said that she did not compare any hairs found on the mother's body to any other person other than the mother and appellant.

### Jim Swindell

Jim Swindell managed the State Fire Marshal's Arson Lab during the investigation of this case. Swindell tested several items during the investigation, including a black-and-white sock that the mother was wearing when she was found, a package of Marlboro cigarettes, a black-and-white-collared shirt, and a

roll of duct tape—all collected from the mother's apartment after the fire. According to Swindell, all of these items tested negative for accelerants. Swindell also tested two remnants of clothing found among the baby's remains. These remnants tested positive for gasoline. Swindell also said that the white shorts found on the mother tested positive for gasoline.

### Rodney Collins

Rodney Collins testified that he knew the appellant from playing video games and that the two had formed a friendship over the game Golden Tee. Collins said that he also knew Raudry. Collins averred that he knew the appellant to wear short-sleeved shirts and shorts, and he said that he never knew the appellant to have a skin condition, to complain about itching skin, or to break out in red welts.

Regarding the appellant's involvement in the murders, Collins averred that he felt that appellant had asked him to lie about the appellant's whereabouts on the night of the murders. By Collins's account, the appellant asked Collins to say that the two were playing Golden Tee at Volcano's in Hurst at the time of the murders. Collins said that he told the appellant that he would have to check playing logs to see if that was true, but Collins verified that the two were not playing on that evening. Collins further averred that he was at Volcano's on the night of the murders and that he did not see the appellant there. Collins also said that the appellant had told him that the mother was seeking child support, that

33

the appellant denied paternity, and that he had expressed an inability to make child support payments.

### Dr. Nizam Peerwani

Dr. Nizam Peerwani, Chief Medical Examiner for the Tarrant County Medical Examiner's Office, testified. Peerwani averred that he did not perform the autopsies on the mother's and baby's remains but that he was testifying based on his review of the file prepared by the examiner who did perform them. Peerwani said that the examiner who performed the autopsies was no longer employed there.

According to Peerwani, the mother died of multiple stab wounds and was deceased before the fire started. Peerwani said that his opinion that the mother was deceased prior to the fire was based on the lack of carbon monoxide present in her blood and the absence of soot in her trachea and bronchial tree. Peerwani said that in his opinion, the mother had been stabbed with a knife eleven times—seven times in her back and four times in her front. She had been stabbed in the neck, left ear, right upper back, and left back. Peerwani said that she had also suffered a "large gaping" stab wound to the right side of her chest and a "very large wound" "below [her] right breast." The mother also had defensive-cut-like wounds on her forearms. Moreover, she also had superficial-cut-like wounds and contusions to her neck, left ear, shoulder, and back area. Peerwani also surmised that the mother may have fallen during a struggle and struck her head on something hard. Peerwani ruled the mother's death a homicide.

34

As to the baby, Peerwani said that his opinion was that the baby had extensive thermal burns; that there was no evidence of soot in his trachea and bronchials; that there was no carbon monoxide present in his blood; and that there was "so much damage that one cannot be absolutely certain the exact mechanism of death, but it [was] a violent death of some kind." Peerwani went on to say that he could not rule out head trauma or suffocation but that he could say that the baby did not die of smoke inhalation. Peerwani ruled the baby's death a homicide.

Peerwani also testified regarding his medical opinion of whether the appellant suffered from eczema and if the scratches found on his body the day after the murders were consistent with the skin disorder. According to Peerwani, the scratches found on the appellant's body were not consistent with eczema but were consistent with having been scratched with fingernails, either the appellant's or someone else's.

### Byron Stewart

Police Detective for the Arlington Police Department Byron Stewart testified that he was called to the fire scene shortly after the mother's body was pulled from the apartment. According to Stewart, the baby's whereabouts was still unknown when he arrived. Stewart said that after observing the mother's body, including what appeared to him to be knife wounds on her left breast, he walked through the apartment, noting the large blood-stained areas in the living room. Stewart said that he initially left the scene and turned his investigation to

35

finding the baby. A few hours later, he received word that the remains of an infant's body had been found in the apartment. Stewart returned to confirm. Stewart said that due to the damage to the body, he initially had a hard time determining that the remains were in fact that of a child. Stewart also averred that based on the crime scene, the baby's death was not merely incidental to the mother's killing but an additional deliberate killing.

From there, Stewart said that he left to interview the mother's parents and then her friend, Kristian Perdue. Stewart also received access to the mother's Facebook account. Stewart said that initially he had an interest in the appellant as a person who might have been keeping the baby the night of the fire because he had been informed that the appellant was the baby's biological father. After other officers made contact with the appellant the following afternoon, Stewart interviewed him at the Grapevine Police Department. Stewart said that the appellant was wearing a dark hoodie. A copy of this interview was admitted and played for the jury. As the interview played, Stewart described what was occurring in the interview. According to Stewart, the appellant said during the interview, "Please tell me my son is fine." But Stewart said that the appellant never cried or shed a tear upon learning of the baby's death. Stewart said that he concluded that the appellant was not remorseful about the baby's death.

Stewart said that the appellant discussed having contacted the mother, through text messages, the day of the murders but having told her that he could not meet with her because he did not have a car. Stewart said that during the

36

interview, he began to believe that the appellant was not being truthful to him about his whereabouts and his involvement in the fire and murders. Stewart also said that he grew suspicious about the appellant because he began to make statements about how the officers to that point had not seen him scratch and how he did not like to take his shirt off when at a swimming pool. According to Stewart, the appellant had scratch marks on his hands, but Stewart said that he never saw the appellant scratch himself until he took his shirt off.

Stewart said that overall, the appellant seemed to be cooperative, but that the appellant became hesitant when Stewart inquired about photographing appellant's body. Stewart said that the appellant became particularly hesitant about having his chest and back area photographed. By Stewart's account, the appellant was also hesitant about officers searching the Ford Explorer.

After having the appellant remove his shirt, Stewart observed scratch marks on the appellant's torso, including his stomach, chest, left shoulder, and back. Photographs of the appellant and these scratch marks were admitted and published to the jury. Stewart recalled that as the photographs were being taken, the appellant began to scratch himself. Other than the scratch marks and the sudden redness caused by the appellant scratching himself, Stewart said that he did not otherwise observe any welts or skin discolorations on the appellant's body.

During Stewart's time on the stand, the State also introduced photographs of the appellant that Stewart took at a later time when Stewart collected DNA

37

samples from the appellant. In some of these photographs, the appellant can be seen without a shirt on. Stewart testified that he could not see any evidence that the appellant had red splotches or bright red scratches on his torso in these pictures, but Stewart did observe a scar consistent with a scratch he had observed on the appellant's body the day after the murders. According to Stewart, the appellant did not scratch at all during the time when Stewart took pictures of his hair or pubic area, but when Stewart began to photograph his body, the appellant began to scratch his torso.

### Ryan Bridges

Ryan Bridges testified that he formerly worked with the appellant at Truluck's restaurant. Bridges said that the appellant was generally a "jovial" person to work with. But Bridges recalled how a woman had come into the restaurant one evening and made the appellant very uncomfortable. By Bridges's account, the appellant said that he had had a previous relationship with the patron and that she "wouldn't leave him alone." Bridges also testified that he never knew the appellant to have any type of skin disorder and never knew him to scratch himself.

According to Bridges, a former concealed handgun license instructor, the appellant came to him a few months prior to the murders and asked Bridges whether Bridges "could find a firearm that nobody would kn[o]w he had." Bridges said that the appellant knew that he was a former handgun instructor. Bridges averred that the appellant said that he needed the gun because he wanted to

38

shoot raccoons in his backyard. Bridges said that the appellant also asked Bridges to obtain a silencer for the gun as well.

### Shelly Slaughter

Shelly Slaughter, a waitress at Truluck's, testified that she also formerly worked with the appellant at the restaurant. Slaughter described an incident in the restaurant where a woman with a baby came in with friends and sat in the back of the restaurant. According to Slaughter, the appellant refused to leave the kitchen while she was there "because he didn't want her to see him or to see her." Slaughter described the appellant's behavior as "[v]ery anxious, upset, [and] not wanting to be anywhere there." Slaughter said that the appellant told her that the woman was claiming that he was the father of her baby. Like Bridges, Slaughter said that she never knew the appellant to complain of a skin condition nor did she know him to scratch himself or have red welts on his body.[5]

### Gabriel Salinas Jr.

Gabriel Salinas Jr. also testified that he had formerly worked with the appellant at Truluck's. Salinas said that during the Christmas season of 2010, the appellant asked him if he "could stand in [the appellant's] place and take a paternity test instead of him." By Salinas's account, the appellant was concerned that he would be the biological father of a child and that the appellant "wanted to

---

[5]In its brief, the State alleges that Slaughter testified that the appellant had asked him how to obtain an unregistered handgun and that she directed him to Bridges. The record reveals that Slaughter testified to these facts outside the presence of the jury.

be cleared of that." Salinas recalled that the appellant said that the test might have been "court-ordered." Salinas said that the appellant asked him to do this "a couple of times" and that the appellant even offered Salinas a Best Buy employee discount in return.

### Lana Murphy

Lana Murphy testified that she was the baby's babysitter. Murphy said that she last spoke to the mother by telephone at 9:02 p.m. on the night of the murders.

### Isaac Huerta

Isaac Huerta testified that he had known the appellant for roughly fifteen years. Huerta said that he had known the appellant since high school and had never known him to suffer from eczema nor had he known him to constantly scratch his skin or break out in welts. Huerta recalled that sometime around St. Patrick's Day 2011, he called the appellant, who was upset and said that he had "taken some pills." Huerta said that he urged the appellant to call paramedics and that the appellant expressed sadness over his breakup with Raudry. According to Huerta, the appellant called him a short time later and said that he had thrown up the pills.

Huerta said that he and another friend came to see the appellant the weekend of the murders. According to Huerta, the appellant told him that his breakup with Raudry was because Raudry thought that the appellant was cheating on her. Huerta said that the appellant denied having a sexual

relationship with anyone but that later in a phone call, the appellant told him that he had been sending "lewd" pictures to another woman.

### Miles Thayer

Miles Thayer testified that he served in the Air Force Reserve with the appellant. Thayer recalled how in April or May of 2011, he picked up the appellant to take him to required weekend drills and that the appellant told him that he was a suspect in a murder. According to Thayer, he inquired whether the appellant was involved, and the appellant specifically said that he was at home doing laundry when the murders occurred.

### Elizabeth Rosenauer

Elizabeth Rosenauer, a crime scene investigator with the Arlington Police Department, testified that she photographed the appellant's apartment and the Ford Explorer on March 21 and 22, 2011. Rosenauer said that one of the photographs that she took was of a marked page in a Bible found in the appellant's apartment. According to Rosenauer, the Bible had been bookmarked on a section that reads "murder." A picture of the page that was marked in the appellant's Bible was published to the jury.

Rosenauer said that when photographing the Ford Explorer, she smelled gasoline. She said, "[Y]ou could smell it before the vehicle doors were actually opened." Rosenauer stated that the gasoline smell "was strong" and that one "could just smell it all the way around the vehicle."

41

### *Richard Weber*

Detective Richard Weber of the Grapevine Police Department testified that he is assigned to computer and cellphone forensics. Weber said that after the appellant gave officers permission to search his phone, he took photographs of calls and texts on the phone. According to Weber, the appellant's phone showed several missed calls from the mother to the appellant between 3:55 p.m. and 5:17 p.m. on the night of the murders. The appellant's phone also showed multiple blocked calls from the mother to the appellant between 6:17 p.m. and 7:10 p.m. The appellant's phone then showed a missed call from the mother at 7:03 p.m. and then an incoming call that lasted nearly one minute at 7:10 p.m. The appellant's phone also revealed that his phone had called the mother's phone several times that evening, including calls lasting for four minutes, for three seconds, and for forty seconds—all made at roughly 5:50 p.m.

Weber averred that the appellant's text messages demonstrated a text conversation between the mother and the appellant beginning at 5:29 p.m. That conversation went as follows:

The mother:   Just forget it. I don't care.

The appellant:      Really?

The mother:   Really, what?

The appellant:      You don't care?

The mother:   You won't call me back.

The appellant:      So.

The mother: I'm trying to be serious here. I really need to talk. It will just take a minute.

The appellant: Then give me a few.

The mother: That's what you want anyways.

At 7:04 p.m., the mother then texted the appellant stating, "I'll be at my house in ten, call me so I can give you directions." At 10:07 p.m., the appellant texted back, "Sorry, since I have no car, I can't go." This text message also contained a frowning emoticon.

### *Michael Weaver*

Detective Michael Weaver of the Arlington Police Department testified that he recovered fragments of Facebook conversations between the mother and Raudry from the mother's laptop computer. These conversations occurred between March 15, 2011, and March 17, 2011. Weaver described the conversations as amicable. Weaver also discovered that the mother had conducted Internet searches on the appellant and Raudry. Weaver determined that the last time the mother logged in to her Facebook account was 9:01 p.m. on March 20, 2011. Activity on the mother's computer also demonstrated that she checked a website at 9:08 p.m. Weaver further found digital data on a thumb drive found in the mother's apartment. The data on that drive contained thirteen photographs of a male's genitalia and the files were named "T", "Thomas", and "T3". Weaver averred that the pictures were all of the same male.

### Mark Sedwick

Special Agent Mark Sedwick of the Federal Bureau of Investigation's Dallas branch, testified that he analyzed cell tower data associated with the appellant's cellphone. Sedwick also prepared a map and a PowerPoint presentation regarding this data that he utilized as he testified before the jury. According to Sedwick, between 3:51 p.m. to 5:53 p.m. on the night of the murders, the appellant's cellphone was within three quarters of a mile of a cell tower near Volcano's Bar and Grill in Hurst, Texas. Sedwick said that the data indicated that at 5:58 p.m., the appellant's phone usage moved east and that the appellant's phone had called the mother's phone. Then at 6:00 p.m., data indicated that the appellant's phone had migrated over a seven-minute period from Hurst to the Arlington area. Sedwick averred that the appellant's phone then called the mother's phone at 6:11 p.m. and that the appellant's phone was now in Arlington near the intersection of Lamar and Collins streets. Six minutes later, according to Sedwick, the appellant's phone was within three quarters of a mile of a cell tower "that covers an area that includes the murder location." Specifically, Sedwick said that the cell tower was "[a]pproximately .4 miles" away from the mother's apartment. Sedwick said that the data demonstrated that the appellant's phone was involved in a series of texts and calls from 6:20 p.m. to 6:36 p.m. at this same tower. The data also showed that the appellant's phone was in the same geographical area initiating and receiving calls and texts from the mother's phone between 7:03 p.m. and 9:22 p.m. Sedwick averred that later,

44

between 11:37 p.m. on March 20 and 5:30 a.m. on March 21, the appellant's phone was in the vicinity of the appellant's apartment in Grapevine.

Specifically addressing the types and frequency of communications between the mother and the appellant, Sedwick averred that the appellant sent a text to the mother at 3:51 p.m. on March 20, 2011. Sedwick said that this data contradicted the appellant's statement to police that the mother was the first to contact him on March 20. Sedwick said that between 3:51 p.m. and 5:58 p.m. there was a series of text messages and phone calls between the appellant and the mother, ending with the appellant calling the mother at 5:58 p.m. Sedwick thus averred that the data contradicted the appellant's assertion that the mother had first called him at 7:04 p.m. Sedwick further averred that the data contradicted the appellant's statement that he called the mother but that she would not answer even after she sent him a text at 7:05 stating that she would be home in ten minutes and to give her a call. He also said that the data contradicted the appellant's statement that he called the mother shortly after 7:00 p.m. and informed her that he was lost. Moreover, Sedwick said that the data contradicted the appellant's statement that the mother had repeatedly called him the weekend prior to the murders and, rather, the data showed no communication between the mother and the appellant until he contacted her at 3:57 p.m. on March 20, the day of the murders. Sedwick also said that the data contradicted the appellant's statement that he was at Volcano's in Hurst playing Golden Tee at any time after 6:00 p.m. on March 20.

45

Sedwick said that the last communication between the mother and the appellant was a call from her to him at 7:10 p.m. that lasted nearly two minutes. He said that after that, there was no communication between the appellant and the mother's phones until he texted her at 10:07 p.m.—a text that originated while the appellant's phone was communicating with a cell tower in close proximity to the mother's apartment. Sedwick averred that the last text stated, "Sorry. Since I have no car, I can't go."

Sedwick's analysis also revealed that the mother's mom had called the appellant and left two messages at 1:41 a.m. and 1:42 a.m. on March 21 and that the appellant had checked those voice messages at roughly 5:30 a.m.

### John Witkowski

John Witkowski, a forensic scientist for the Texas Department of Public Safety, testified at trial as well. Witkowski analyzed the mass of hair found on the mother's left hip, hairs found on her buttocks, and trace materials from her left foot. Witkowski said that he found no hairs similar to the appellant's hair in these samples but that he did find two hairs that were dissimilar to both the appellant and the mother. He also found animal hairs in the samples.

### Connie Patton

Connie Patton, DNA technical leader for the Tarrant County Medical Examiner's Office, testified that she tested the items collected from the mother's apartment for DNA and that she also tested items collected from the appellant's apartment for blood and DNA. Patton averred that DNA testing is difficult in an

46

environment that is fraught with fire because DNA begins to burn off between 180 and 200 degrees Fahrenheit. Specifically, she said that obtaining any "interpretable DNA profile[s]" in this case was "not very likely." According to Patton, some items did test positive for the mother's DNA and some items demonstrated a "minor" presence of another person's DNA, but he said that due to the condition of the samples, the DNA could not be matched to the mother, the baby, the appellant, or Jopson—the DNA models given to Patton by investigators to compare with any potential DNA found. Patton also said that she found the minor presence of male DNA that could not have come from the baby, the appellant, or Jopson. Patton said that all blood samples tested were confirmed to have been the mother's blood. According to Patton, none of the items from the appellant's apartment tested positive for the mother's blood or DNA.

### Stipulated Evidence

Prior to the State closing, the appellant stipulated that DNA testing between himself and the baby indicated that the likelihood of the appellant's paternity to the baby was 99.9999 percent.

### Meda Bourland

The Defense called Meda Bourland. Bourland testified that she was representing the appellant in a family law case concerning his and Raudry's daughter. Bourland said that on March 8, 2011, the Attorney General of Texas had filed a petition against the appellant alleging that he was the baby's father. According to Bourland, the constable attempted to serve the appellant three

47

times regarding the lawsuit but was unsuccessful. Bourland said that because he had not been served, there would have been no court dates set for the paternity suit. Bourland averred that he was under no court order to deliver a DNA test to the Attorney General. But Bourland did say that she would have "no doubt" that the appellant could have received a letter from the Attorney General asking him to come to a conference regarding his paternity to the baby prior to the Attorney General's petition having been filed.

### Paula Green

Paula Green, a private investigator who is also a pool player, testified in the appellant's defense. Green said that she had frequented a pool establishment in Arlington, Texas, called Wizards that was in business at the time of the murders. She averred that Wizards was in the cell tower area where investigators said that the appellant was during the murders.

### Stanley Cantly

Stanley Cantly testified for the defense that he lives at the Presidents Corner Apartments. According to Cantly, he knew the mother and had seen her at her car between 7:00 p.m. and 8:00 p.m. on the night of the murders. Cantly said that the mother was talking on her phone and that she appeared to be arguing with the person on the other end of the call. Cantly further stated that about the time he saw the mother on the phone, he saw someone's grill smoking and unattended on the sidewalk. He also averred that he had seen a stocky man

with a burr haircut with the mother on more than one occasion, including when she moved in.

### Marsha Bloxom

Marsha Bloxom, the lead clerk for the 372nd District Court, testified for the defense as well. Bloxom said that her review of Tarrant County records revealed that there was a person named Asher Rion, born July 10, 1992, who lived in Keller, Texas, and had a warrant out for his arrest.

### Derek Hicks

The State called Derek Hicks as a rebuttal witness. Hicks said that he was the mother's half-brother and that he worked at a Harley Davidson dealership in Grand Prairie. According to Hicks, he helped the mother move into the Presidents Corner Apartments. He stated that he used to have a "buzz cut" haircut and had one at the time he helped the mother move. Hicks also said that he had a phone conversation with the mother the day she was killed at around 6:30 p.m.

### The Jury's Verdict, Sentencing, and Appeal

The jury returned a verdict of guilty on the charge of capital murder—that the appellant had murdered both the mother and the baby during the same criminal transaction. The trial court entered judgment accordingly, and because the State had waived the death penalty, the trial court sentenced the appellant to life in prison. This appeal followed.

## IV. DISCUSSION

### A. Sufficiency of the Evidence

In his first point, the appellant argues that the evidence is insufficient to support his conviction. Specifically, the appellant argues that the lack of physical evidence linking him to the murders compels this court to hold that the evidence is insufficient. We disagree.

#### *1. Standard of Review*

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs*, 434 S.W.3d at 170. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are

reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see Crabtree v. State,* 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Byrd*, 336 S.W.3d at 246. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013); *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by

51

the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Dobbs*, 434 S.W.3d at 170; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

### 2. *Capital Murder*

To convict appellant of capital murder, the jury in this case was required to find that the appellant intentionally caused the death of two individuals, the mother and the baby, during the same criminal transaction. Tex. Penal Code Ann. § 19.03(a)(7)(A) (West Supp. 2016). More specifically to the trial court's charge to the jury, which was predicated on the indictment and the evidence introduced at trial, the jury had to find

> from the evidence beyond a reasonable doubt that on or about the 20th day of March 2011, in Tarrant County, Texas, [the appellant], did then and there intentionally or knowingly cause the death of an individual, Mechelle Gandy, by cutting her or stabbing her with an item . . . and during the same criminal transaction . . . intentionally or knowingly caused the death of another individual, Asher Olivas, by setting fire to his body by igniting a combustible or flammable material with an open flame; OR

> did . . . intentionally or knowingly cause the death of an individual, Mechelle Gandy, by cutting her or stabbing her with an item . . . and during the same criminal transaction . . . intentionally or knowingly caused the death of another individual, Asher Olivas, by setting fire to a combustible or flammable material with an open flame in close proximity to the body of Asher Olivas; OR

> did . . . intentionally or knowingly cause the death of an individual, Mechelle Gandy, by cutting her or stabbing her with an item . . . and

52

during the same criminal transaction . . . intentionally or knowingly caused the death of another individual, Asher Olivas, in a manner and by a means which are unknown.

Viewing the evidence in the light most favorable to the jury's verdict, and taking the reasonable inferences from that evidence, the evidence showed that the appellant stabbed the mother to death and then set fire either to the baby directly using gasoline or using gasoline to set a fire immediately around his bed, and thus killed him by burning him to death.

### The Appellant's Presence at Murder Scene

The State offered evidence that reasonably showed that the appellant was at the mother's apartment at the time she and the baby were murdered. Cell tower data showed that between 6:00 p.m. and 10:07 p.m., the appellant was within three quarters of a mile of the mother's apartment. Rather than admit this, the appellant lied to police about what time he arrived in Arlington, and evidence showed that he attempted to create an alibi wherein he was still at Volcano's until nearly 9:00 p.m. Indeed, the State introduced evidence that the appellant asked Collins to lie about having been with him at Volcano's the night of the murder. Moreover, the appellant lied to other people about his whereabouts at the time of the murders, once saying he was at home and another time saying that he was at a friend's house. A reasonable inference from this evidence is that the appellant was attempting to create a false alibi. *See Longoria v. State*, 154 S.W.3d 747, 757 (Tex. App.—Houston [14th Dist.] 2004, pet ref'd) ("The jury

could have inferred guilt from this testimony because an attempt to procure a false alibi is some evidence of guilt.").

The appellant refutes that he could have been at the mother's apartment at the time of the murders by pointing to evidence that he said that he did not know where her apartment was and that a text from the mother stated that she would call him with directions. Thus, the appellant contends he could not have known where the mother's apartment was. But cell tower data demonstrated that after the text from the mother was sent, she and the appellant had a roughly two-minute conversation. A reasonable inference from this evidence is that it was during this phone conversation that she told the appellant where her apartment was. This inference is strengthened by the evidence that the mother wanted desperately to speak with the appellant and that he agreed go to her apartment. She wasn't hiding from him; she wanted to talk to him and told him she would give him directions when she arrived at home. The roughly two-minute conversation after this text supports that she told him where she lived. The text supplies the purpose of the call. It also strains credulity to believe that after the two had communicated so frequently about him coming to see her between 5:00 p.m. until that last phone call just past 7:00 p.m., that all communication between the two would stop until just after 10:00 p.m., minutes after the apartment was set ablaze. It is a reasonable inference from this evidence that the reason the communication ceased during that time—a time wherein she was murdered—is because the appellant was in her apartment.

It is also a reasonable inference from the voluminous evidence regarding the appellant's propensity to lie about his relationship with the mother that he was lying about not knowing where she lived and why he sent his last text to her. The evidence demonstrated that just after the fire was set, prior to firefighters responding and after cellphone communications had ceased between the mother and the appellant long enough for the appellant to have committed the murders and set the fire, the appellant texted the mother that he would not be able to make it to her apartment because he did not have a vehicle. This text stands as a clear outlier to the rest of the communications between the appellant and the mother that night, which all centered on him coming to her apartment. He had never indicated that he would not be able to make it to her apartment or that he did not have a vehicle. Further, the appellant's explanation to police that the reason he had sent the text was because he needed to return Rowe's vehicle reeks of fabrication—Rowe was in Virginia and did not need her vehicle back until later the following day. Indeed, the appellant drove the borrowed vehicle to work and back to his apartment the day after the murders. The reasonable inference from this evidence is that the appellant was in the mother's apartment and that he attempted to create an alibi by sending the text minutes after he had committed the murders and set the fire. *See Longoria*, 154 S.W.3d at 757.

### *The Presence of Gasoline in the Ford Explorer*

The State further offered evidence that whoever set the fire in the mother's apartment used gasoline to accelerate the fire. Statements from multiple law-

enforcement officials and from the appellant himself place a strong odor of gasoline in the Ford Explorer that the appellant admitted he was driving in Arlington at the time of the murders. The owner of the vehicle also said that there was a strong odor of gasoline in the vehicle when it was returned to her weeks later and that it took multiple cleanings to dissipate the smell.

During his first interview with police, the appellant repeatedly said that there was a gasoline smell in the Ford Explorer— the appellant volunteered this information without being prompted by police about the smell. At the time, investigators did not know that gasoline was the accelerant used in the fire. A reasonable inference from this evidence is that the appellant had gasoline in the vehicle and used it to set fire to the mother's apartment and, more specifically, to the baby's bedroom or body. The appellant later stated that he only vaguely remembered the smell of gasoline, but a reasonable inference from this statement is that he was attempting to cover up the fact that he had gasoline in the vehicle on the night of the murders. The most telling of the appellant's statements about gasoline was made to Rowe, before he was interviewed by police, wherein the appellant told her that he had spilled gasoline in the Ford Explorer and that she would be upset about the smell. In effect, the appellant attempted to preempt what he considered would be very incriminating evidence against him showing his guilt—he needed to account for the smell of gasoline in the vehicle he was driving. And equally compelling is that the appellant spoke to the very cause of the fire and the baby's murder—gasoline. Of all the possible

subjects to be talking about within hours of the murders to both Rowe and the police, the appellant singled out gasoline, the source of the smell of the very accelerant used in the fire at the apartment.

He also told Rowe that the gasoline smell was related to him having helped a friend mow a lawn. But when the appellant spoke with the police, he said that he thought the vehicle was "leaking gas," and the appellant told police that he mentioned it to Rowe but that she did not know the source of the smell. The reasonable inference from these inconsistent statements is that the appellant was lying about having had gasoline in the vehicle and having used it to set fire to the mother's apartment. *See Lozano v. State*, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref'd) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations are also probative of wrongful conduct and are circumstances of guilt."), *citing Gear v. State*, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011) (recognizing that factfinder can consider a defendant's untruthful statement as affirmative evidence of guilt).

The appellant argues that the State "failed to support that there was gasoline" in the Ford Explorer. Specifically, the appellant points to the fact that testing on samples from inside the vehicle tested negative for gasoline. But numerous witnesses and the appellant himself all said that the vehicle contained a strong smell of gasoline. It was the jury's province to rectify this conflicting evidence and the reasonable inferences from the evidence, and we must

presume that the jury resolved this conflict in favor of its verdict. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

### *Scratches on Olivas's Hands, Arms, and Torso*

The evidence also shows that the appellant preempted another incriminating piece of evidence, scratches on his body, in anticipation of evidence that the mother scratched him during a struggle when he stabbed her. The appellant could not know that incriminating DNA would not be forthcoming as evidence against him. Officers noted and took pictures of scratches on his hands, arms, and torso. One of the medical examiners testified that the mother had struggled with her assailant and possibly even struck her head after falling during the struggle. Rather than having a legitimate explanation for the scratches to his hands and torso, the appellant told officers that he had long experienced eczema and that he routinely scratched himself, that he would not wear short-sleeved shirts or go shirtless at a pool, and that he often wore hoodies even when it was hot. The appellant even invited officers to question Raudry about how he would often scratch himself in the night, leaving red welts and causing himself to bleed. But Raudry testified that she never knew the appellant to suffer from eczema during their several-year relationship, that she never knew him to scratch and cause himself welts, and that, contrary to what he told police, she knew the appellant to wear short-sleeved shirts and sometimes go shirtless at a swimming pool. Several other witnesses testified that they had never known the appellant to scratch or suffer from eczema.

The medical examiner gave his medical opinion of the scratches that were found on the appellant's torso and concluded that they were not consistent with eczema but, rather, that they were consistent with having been scratched by someone's fingernails. The reasonable inference from this evidence is that the appellant was attempting to cover up the fact that the mother had defensively scratched him while he was stabbing her. *See Drew v. State*, 76 S.W.3d 436, 446 (Tex. App.—Houston [14th Dist.], pet. ref'd), *cert. denied*, 537 U.S. 1047 (2002) (reasoning that evidence that defendant had scratches on arm and neck on day victim was murdered was some evidence of a struggle between defendant and victim).

The appellant argues that if the mother had scratched him, then his DNA would have been found under her fingernails. But testimony from investigators revealed that because of the fire, it was expected that DNA would not be found. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

### *Evidence That the Appellant Hated the Mother and Baby*

The evidence demonstrates that the appellant was also upset at the idea of having to pay child support, that he attempted to conceal his paternity, and that he loathed the mother and baby because their existence interfered with his relationship with Raudry. The State introduced evidence that the appellant felt that he could not financially pay child support for the baby. Raudry said that the appellant had made statements that he could not afford to pay child support and that he was upset at the prospect of having to do so. The State introduced

evidence that the appellant solicited a coworker to pretend to be him and to give a sample of DNA to thwart tests to prove that he was the baby's biological father. Even after the murders, the evidence reveals that the appellant continued to deny his paternity.

Raudry testified that the appellant referred to the mother as "bulldog" and "b____" and that he said that he "f_____ hate[d] her." The evidence also revealed that the appellant thought of the baby as "that f_____ baby" and "the devil's child." Moreover, multiple witnesses testified that the appellant tried to avoid the mother when she would come into where he worked and that her presence made him agitated and anxious. And the State introduced evidence that the mother had revealed his relationship with her to Raudry, that Raudry and the appellant had broken up over the mother and baby, and that the appellant was nearly suicidal because of the breakup. The mother's and baby's murders occurred less than five days after the breakup. The appellant told police that he did not want the mother in his life.

And the personal nature of the murders cannot be ignored. The evidence reasonably infers that whoever killed the mother and baby did so in a very personal and brutal way. The mother was stabbed eleven times, including seven times in her back. And the most vicious of wounds were inflicted directly upon her chest, including a "large gaping" wound to her right chest area and a "very large wound" just below her right breast. The vicious nature of her injuries indicates that whoever killed her hated her—and the appellant had expressed his

60

utter hatred of her. The same personal slaughter was inflicted upon the baby. Indeed, it can be reasonably inferred from the evidence that gasoline was either poured directly onto the baby's body or immediately around him as he slept in his crib. This type of brutal killing was consistent with someone who thought of the baby as "the devil's child."

A reasonable inference from this evidence is that the appellant desired that the mother and baby be gone because he loathed them and that the appellant believed that he would not have to pay child support if both of them were dead.

### Evidence That the Appellant Planned to Murder

The State also introduced evidence that the appellant attempted but failed to obtain an unregistered handgun and a silencer. The reasonable inference from this evidence is that the appellant had previously planned to murder the mother and baby using the unregistered gun and silencer. The State also introduced evidence that the appellant had marked a headnote in his Bible titled "murder." A reasonable inference from this evidence is that the appellant was contemplating murder when he marked the passage.

In short, the State provided evidence that the appellant wanted the mother and baby out of his life; that he was upset that the mother had revealed their relationship to Raudry; that the appellant lied about being in her apartment at the time the murders and fire occurred; that the appellant drove a vehicle that smelled of gasoline, the identified accelerant utilized in the fire; and that he attempted to create a false alibi. We conclude that a rational factfinder could

61

have found beyond a reasonable doubt that that the appellant stabbed the mother to death and then, in the course of the same criminal episode, set fire either to the baby directly using gasoline or used gasoline to set a fire immediately around the baby's bed, and thus killed him by burning him to death. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170. We overrule appellant's first point.

## B.     Records of the Appellant's Cellphone Usage

In his second point, the appellant argues that the trial court erred by allowing the State to introduce data pertaining to his cellphone communications for the time period from March 1, 2011, through March 22, 2011. Specifically, the appellant argues that data showing his phone's whereabouts at the time of the murders was obtained and introduced in violation of his rights from unreasonable searches and seizures under the United States and Texas constitutions. We disagree.

The evidence of which the appellant complains was obtained by the State using a court order issued under a prior version of Texas Code of Criminal Procedure article 18.21 § 5(a). *See* Acts 2013, 83rd Leg., ch. 1289 (H.B. 2268), §§ 5 to 13, eff. June 14, 2013 (current version at Tex. Code Crim. Proc. Ann. art. 18.21 § 5A(a)). Under the prior version, a showing of probable cause was not required to obtain a court order requiring a cellphone service provider to disclose electronic customer data. *See id.* Instead, the statute required only a "reasonable belief that the information sought is relevant to a legitimate law

62

enforcement inquiry." *Id.* The appellant concedes that law enforcement in this case complied with the statute.

In *Ford v. State*, 477 S.W.3d 321, 322 (Tex. Crim. App. 2015), the Court of Criminal Appeals considered whether the State's warrantless acquisition of historical cell tower location information violated the Fourth Amendment. The Court concluded that "[t]he State did not violate Ford's Fourth Amendment rights when it obtained . . . information by way of a court order under Article 18.21 § 5(a) of the Texas Code of Criminal Procedure–an order available on a showing short of probable cause." *Id.* The Court further concluded that "Appellant had no legitimate expectation of privacy in records held by a third-party cell-phone company identifying which cell-phone towers communicated with his cell phone at particular points in the past." *Id.* at 330. *Ford* did not address a challenge under Article I, Section 9 of the Texas constitution.

The Texas Court of Criminal Appeals has stated that it "will not be bound by Supreme Court decisions addressing the comparable Fourth Amendment issue" when analyzing and interpreting Article I, Section 9 of the Texas constitution. *See Heitman v. State*, 815 S.W.2d 681, 690 (Tex. Crim. App. 1991). But the Court also has stated that it "will not read Article I, § 9 differently than the Fourth Amendment in a particular context simply because [it] can." *Crittenden v. State*, 899 S.W.2d 668, 673 n.8 (Tex. Crim. App. 1995). The Court further stated in *Crittenden*, "We cannot hold that what this Court believed was reasonable

63

under the Fourth Amendment is somehow not reasonable under Article I, § 9."
*Id.* at 673 n.9.

Further, our sister court in Houston for the 14th District has held that the prior version of Article 18.21 § 5(a) did not violate Article I, Section 9 of the Texas constitution. *Jackson v. State*, 491 S.W.3d 411, 422 (Tex. App.—Houston [14th Dist.] 2016, pet. filed). In its decision, the *Jackson* court reasoned that it could not hold that what the Court of Criminal Appeals believed was reasonable under the Fourth Amendment is somehow not reasonable under Article I, § 9. We agree with our sister court in Houston.

We hold that the State in this case, when they obtained the historical records from a third party concerning the appellant's cellphone usage for the time in question, did not violate either the Fourth Amendment of the United States Constitution or Article I, Section 9 of the Texas constitution. We overrule appellant's second point.

## C.    *Extraneous Conduct Evidence*

In his third point, the appellant argues that the trial court erred by allowing the State to present evidence from Bridges that the appellant asked him about acquiring an untraceable handgun and silencer.[6] We disagree.

---

[6]The State responds in its brief and includes the testimony of Slaughter, but as previously addressed, Slaughter's testimony regarding the appellant's having inquired to her about a gun was not before the jury. Furthermore, the State argues that the trial court gave a limiting instruction regarding testimony about the appellant's seeking a gun. Even though a limiting instruction was discussed outside the presence of the jury, the record reveals that no limiting instruction was given.

This Court reviews the admission of extraneous offense evidence for an abuse of discretion. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009); *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). A trial court does not abuse its discretion if the decision to admit or exclude the evidence is within the "zone of reasonable disagreement." *Orona v. State*, 341 S.W.3d 452, 464 (Tex. App.—Fort Worth 2011, pet. ref'd), *citing Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh'g).

A trial court's determination on the admissibility of extraneous offense evidence typically falls within the zone of reasonable disagreement if the evidence shows: (1) that an extraneous transaction is relevant to a material, non-propensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *De La Paz*, 279 S.W.3d at 344.

Relevant evidence is any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Tex. R. Evid. 401. Evidence of other crimes, wrongs, or acts is not admissible to prove that the accused committed the charged offense in conformity with his bad character. Tex. R. Evid. 404(b). But it may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Tex. R. Evid. 404(b); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App.

65

2011); *Montgomery*, 810 S.W.2d at 387. These exceptions are neither mutually exclusive nor collectively exhaustive. *De La Paz*, 279 S.W.3d at 343.

During the course of the trial, the State had to prove beyond a reasonable doubt that the appellant intentionally committed the murders of the mother and baby. *See* Tex. Penal Code Ann. § 19.03. There was no physical evidence from the crime scene, the Ford Explorer, or the appellant's apartment which connected him to the murders. The State's case was predicated purely on circumstantial evidence. The fact that the appellant sought to purchase an untraceable and unregistered firearm with a silencer two months prior to the murders was relevant to demonstrate the appellant's intent to plan and carry out the murders, and also relevant was that he intended to cover up the murders by not being able to be traced to a gun or be heard shooting the gun, all facts that are similar to the appellant's attempts to cover up the murders by setting fire to the mother's apartment using an accelerant. The evidence of the appellant's seeking an unregistered gun and silencer was relevant to his intent and plan to commit the murders. Thus, the trial court did not abuse its discretion by ruling that the evidence was relevant and admissible.

Even when the admission of extraneous offense evidence is permissible under Rule 404(b), a court must still determine whether the probative value of the offense is substantially outweighed by the danger of unfair prejudice under Rule 403. Tex. R. Evid. 403; *Jabari v. State*, 273 S.W.3d 745, 752 (Tex. App—Houston [1st Dist.] 2008, no pet.); *Blackwell v. State*, 193 S.W.3d 1, 9 (Tex.

App.—Houston [1st Dist.] 2006, pet. ref'd). A court should consider the following factors when conducting a Rule 403 analysis: (1) the strength of the extraneous-offense evidence to make a fact of consequence more or less probable; (2) the potential of the extraneous offense to impress the jury in some irrational but indelible way; (3) the time during trial that the State requires to develop evidence of the extraneous misconduct; and (4) the need by the State for the extraneous evidence. *Blackwell*, 193 S.W.3d at 9 (*citing Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002)). We must uphold the trial court's ruling on a Rule 403 balancing test, whether explicit or implied, if it is within the zone of reasonable disagreement. *Jabari*, 273 S.W.3d at 753.

But, under Rule 403, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, or needless presentation or cumulative evidence. Tex. R. Evid. 403.

Here, the strength of the evidence that the appellant sought an undetectable handgun with a silencer tended strongly to suggest that he was planning and intended to commit the murders and go undetected. The strength of this evidence made the fact of his plans and intent to murder more probable, and this factor weighs in favor of the admission of Bridges's testimony. The nature of Bridges's testimony did not have a strong potential to impress the jury in some irrational way. This factor neither weighs for nor against the admissibility of Bridges's testimony. The State did not spend much time developing this

testimony; indeed, over twenty volumes of reporter's records constituted the State's case in chief, and Bridges's testimony did not make up more than twenty pages of the record.  This factor weighs in favor of the admissibility of Bridges's testimony.  The fourth factor also weighs in favor of Bridges's testimony; as explained above, this was a purely circumstantial case, and the need of the State to introduce evidence of the appellant's intent and plans to murder was strong. We conclude that the trial court did not abuse its discretion in regards to its 403 ruling regarding Bridges's testimony.  We overrule the appellant's third point.

## IV. Conclusion

Having overruled all three of the appellant's points on appeal, we affirm the trial court's judgment.


/s/ Kerry FitzGerald
KERRY FITZGERALD
JUSTICE

PANEL:  DAUPHINOT and GARDNER, JJ.; and KERRY FITZGERALD (Senior Justice, Retired, Sitting by Assignment).

PUBLISH

DELIVERED:  December 30, 2016