

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-14-00412-CR

_____

THOMAS OLIVAS, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 372nd District Court
Tarrant County, Texas
Trial Court No. 1376698R

_____

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion on Remand by Chief Justice Sudderth

## MEMORANDUM OPINION ON REMAND

Appellant Thomas Olivas was convicted of the violent 2011 capital murder of Mechelle Gandy and their infant son, Asher, and was sentenced to life in prison without parole. On appeal, this court affirmed the conviction and, in doing so, upheld the trial court's admission of cell-site location information ("CSLI"). *Olivas v. State*, 507 S.W.3d 446 (Tex. App.—Fort Worth 2016), *rev'd*, No. PD-0561-17, 2018 WL 4344310 (Tex. Crim. App. Sept. 12, 2018) (per curiam) (not designated for publication).

After our decision was issued, the United States Supreme Court held in *Carpenter v. United States* that a search warrant is generally necessary for the government to obtain extensive amounts of CSLI. 138 S. Ct. 2206, 2221 (2018). In light of that decision, the court of criminal appeals vacated this court's judgment and remanded this case to allow us to reconsider Appellant's argument that the trial court erred by denying his motion to suppress 21 days' worth of his CSLI obtained without a warrant. *Olivas*, 2018 WL 4344310, at *1. Because we hold that any such error was harmless beyond a reasonable doubt, we again affirm the trial court's judgment.

### Background

Our 2016 opinion thoroughly details the testimony presented and evidence admitted during the two-week trial. *Olivas*, 507 S.W.3d at 449–69. We will focus on those facts which are particularly relevant to the issue before us, and we refer the reader to our prior opinion for a more in-depth discussion of the facts in this case.

## I. The fire

Arlington law enforcement discovered the bodies of Gandy and Asher in Gandy's burning apartment on the evening of March 20, 2011. Gandy's body, which had been stabbed multiple times, was quickly discovered, but Asher's body was not discovered for another four hours. Fire investigators later determined that the fire had been purposely set, that gasoline had been used as an accelerant, and that the fire originated in Asher's room.

## II. The investigation

### A. The police interview with Appellant

When Arlington Police Detective Byron Stewart interviewed Appellant the day after the fire,[1] Appellant admitted that he had cheated on his long-term girlfriend with Gandy and that Asher was his biological son. During the same interview, Appellant admitted that he had arranged to see Gandy on the night of the fire to discuss a then-pending suit by the State against him for child support. Appellant claimed that Gandy, who had been served with papers related to the suit, did not understand them, so she sought his help. Appellant told Detective Stewart:

> And she finally got fed up and said "I'm going [for] child support" and I said okay, you have got full custody—you just—I don't care. Let's do it, let's finally do it and I've been waiting to get served my papers and she got served hers and she didn't understand them so, uh, I was going to go see her. I don't know where she lives, I've been kinda just dilly

---

[1]Video recordings of this interview were admitted into evidence and shown to the jury.

dallying—"Come on, get it over with. Let me know where you're at" and my friend lent me her vehicle and I was just waiting.

According to Appellant, he had agreed to pay child support. Other than that, however, Appellant had not been involved in Asher's life, nor did he want Gandy or Asher to be involved in his.

As to his whereabouts on the evening of the fire, Appellant claimed that he had been at a bar in Hurst—Volcano's Bar and Grill—from "2, 2:30ish" p.m. until "7, 8" p.m.[2] and that Gandy had texted him around "6, 6:30, 7:00-ish" to talk about the legal papers. The interview continued as follows:

Detective: So you're in Hurst and . . . she's trying to call you and this [is] around 7, 6:30, 7:30 on Sunday?

Appellant: Mmhmm.

Detective: Okay and what happens from there?

Appellant: Well you know I said, I'll take a look at them. I don't know where you live? She's like well I gotta do some stuff before I go home, and she's like I'll text you later and the only thing that she, it's off Lamar. Do you know where that is? Yes I do and . . . I was like well just text me and you know around 7 I started getting like well I gotta start heading on over there . . . and I hung out just literally on Lamar, drove up and down.

Detective: Where is . . . so you agreed to come over to her place?

Appellant: Yes.

Detective: And, uh, you came over about what time?

---

[2]Later in the interview he stated that he had left the bar at "8:30, 9" p.m.

Appellant: I didn't go over to her place.

Detective: Oh, you didn't?

Appellant: I've never been to her place—I've never—

Detective: Where did you go?  Did you come to Arlington?

Appellant: Yes, I did.

Detective: Okay, where did you go in Arlington?

Appellant:  Off Lamar Street—that's—I just went up and down Lamar Street for—until—

Detective: Okay, do you know where Lamar is in Arlington?[3]

Appellant: Yes.

Detective: What street is it off . . . ?

Appellant: The one I know it's off of is 360 that's—

Detective: 360 as far as taking the exit off of Lamar?

Appellant: Yeah.

Detective: And where, how far did you go up Lamar?  I don't understand.

Appellant: Um, all the way for a while and then all the way back.[4]

Detective: All the way where?

Appellant: I don't know the street names over there . . . I really don't.

Detective: You just went all the way up Lamar and all the way back down Lamar?

---

[3]Gandy's apartment was near the intersection of Lamar Boulevard and Collins Street.

[4]He later stated that he went "like three, four" miles on Lamar.

Appellant: A couple times and I actually then stopped at—[5]

Detective: Just all the way up the street and all the way down the street?

Appellant: Yes, sir.

Detective: Did you call her?

Appellant: Yes, I did.

Detective: Okay, and did you tell her you were lost?

Appellant: No, she knew I was waiting for her and she said let me know when you're on your way for directions. I called her and she never answered.

Detective: Oh, she never answered the phone? What time is this? Around what time?

Appellant: Um, I want to say probably about that time around 8.

When Detective Stewart asked why Appellant did not call Gandy to find out her address, Appellant claimed that he had and that Gandy "just never answered," and that the calls went "straight to voicemail" after ringing "like twice." CSLI data would later contradict Appellant, showing that after Gandy texted saying she would call with directions, Appellant's phone received a two-minute phone call from her.

Appellant estimated that he was in Arlington for an hour and a half or two hours, initially saying he stayed in Arlington until, at the latest, "about 9:30ish," but

---

[5]Later in the interview, Appellant explained that at some point he stopped for "probably like 25 to 30 minutes" at a pool hall, but when Detective Stewart asked Appellant to narrow down where on Lamar the pool hall was, Appellant said, "I couldn't tell you," and explained, "I know it was just . . . yesterday, but I'm not familiar with Arlington. I just knew it was off Lamar."

later claiming that he left Arlington around 10:00 p.m. He said that he turned from Lamar onto Collins Street to leave Arlington.

### B. Appellant's cell phone data and CSLI

During its investigation, the State acquired information from Appellant's cell phone in two ways: (1) through a search of cell phone data stored on Appellant's phone[6] that Appellant consented to, and (2) by court-ordered production of CSLI stored by AT&T. Appellant complains of two of three trial court orders authorizing the State to obtain his CSLI. The first authorized the State to obtain CSLI for only a five-hour period, from 7:00 p.m. to 11:59 p.m, on the day of the fire. The second was broader in scope, authorizing the acquisition of CSLI for a 21-day period from March 1–22, 2011.[7] Appellant moved to suppress that evidence before trial but was unsuccessful.

With the aid of a map and powerpoint presentation at trial, FBI Special Agent Mark Sedwick testified about his analysis of Appellant's CSLI and information extracted from his cell phone. Agent Sedwick explained that the data recovered from

---

[6]To the extent the State argues that Appellant's consent to a police search of the contents of his cell phone extended to the State's recovery of his CSLI from AT&T, we need not reach this issue because of our conclusion that any error in admitting the CSLI evidence at trial is not reversible.

[7]The State also obtained CSLI for the month of February 2011, but Appellant did not seek to suppress that evidence. This information was not substantively utilized by the State at trial, as we note below.

Appellant's CSLI revealed his presence near Gandy's apartment during the relevant time period, namely, that—

- Between 3:51 p.m. and 5:53 p.m. on March 20, Appellant's cellphone was within three quarters of a mile of a cell tower near Volcano's Bar and Grill in Hurst.

- At 5:58 p.m., Appellant's phone moved east and called Gandy's.

- At 6:00 p.m., over a seven-minute period, Appellant's phone moved from Hurst to the Arlington area.

- Appellant's phone called Gandy's phone at 6:11 p.m. and was near the intersection of Lamar Boulevard and Collins Street in Arlington at that time.

- At 6:17 p.m., Appellant's phone was within three quarters of a mile of a cell tower that "covers an area that includes the murder location" and was located "[a]pproximately .4 miles" away from Gandy's apartment.

- From 6:20–6:36 p.m., Appellant's phone was involved in a series of texts and calls with Gandy's phone, all of which utilized the same cell tower located near her apartment.

- Between 7:03 and 9:22 p.m., Appellant's phone remained in the geographical area near Gandy's apartment and continued to initiate calls and texts to and receive calls and texts from her phone.

- The last phone call between Appellant's and Gandy's phones occurred at 7:10 p.m. and lasted nearly two minutes. The last text message was from Appellant to her at 10:07 p.m., in which he said, "Sorry. Since I don't have a car, I can't go."

- Between 11:37 p.m. on March 20 and 5:30 a.m. on March 21, Appellant's phone was in the vicinity of his apartment in Grapevine.

## III. The jury's verdict

The jury found Appellant guilty of capital murder. Because the State had waived the death penalty, the trial court sentenced Appellant to life imprisonment.

8

## Discussion

The sole issue before us on remand is whether the trial court reversibly erred when it denied Appellant's motion to suppress CSLI obtained by the State. Because we hold that any error in the trial court's denial was harmless, we affirm the trial court's judgment.

## I. Error analysis

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

There is no dispute as to the suppression facts in this case—the State filed three applications for court orders to obtain Appellant's CSLI, and it never attempted to obtain a warrant for that information. While this case was pending at the court of criminal appeals, the United States Supreme Court in *Carpenter* held that because a suspect has a reasonable expectation of privacy in the record of his physical movements, in the absence of exceptions supporting a warrantless search, a search warrant is generally necessary for the government to obtain extensive amounts of

CSLI. 138 S. Ct. at 2221. The Supreme Court held in *Carpenter* that the federal government's warrantless acquisition of seven days of CSLI on a robbery suspect violated the suspect's Fourth Amendment rights, but it left open the possibility that a warrantless search of a more limited period of CSLI would not invoke the Fourth Amendment. *Id.* at 2217, n.3 (noting that it was not necessary to decide how long of a period is acceptable and holding that "accessing seven days of CSLI constitutes a Fourth Amendment search").

Applying *Carpenter*, it is clear that the State's warrantless acquisition of 21 days of Appellant's CSLI violated his Fourth Amendment rights. *Id.* What is not clear is whether the State's acquisition of five hours[8] of Appellant's CSLI on the date of the fire violated those rights. We need not answer this question, however, because any violation by the State in obtaining Appellant's CSLI without a warrant constituted harmless error. *See Dixon v. State*, No. PD-0048-19, 2020 WL 220101, at *2 (Tex. Crim. App. Jan. 15, 2020) (presuming error in denial of CSLI-suppression request and proceeding to harm analysis).

---

[8]The court of criminal appeals remanded this case for our consideration of Appellant's third issue in his petition for review, which was phrased: "Twenty-one days of cell [s]ite location data should have been obtained by a probable cause affidavit and warrant, as is being determined by the United States Supreme Court in *Carpenter v. U.S.*, 16-402 (U.S.)." We interpret his argument as including the State's acquisition of five hours of CSLI (through its first application), which happened to be within the dates of the 21-day acquisition (obtained through its second application).

10

## II. Harm analysis

Assuming without deciding that the trial court erred by denying Appellant's suppression motion, we must review the record to determine if the error is reversible. *See* Tex. R. App. P. 44.2. We review suppression error for constitutional harm under Rule 44.2(a). *See Dixon*, 2020 WL 220101 at \*2. Constitutional error requires us to reverse the conviction unless we determine beyond a reasonable doubt that the trial court's denial of the motion to suppress did not contribute to the conviction. *See* Tex. R. App. P. 44.2(a); *Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error [is] not harmless beyond a reasonable doubt." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000); *see also Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008).

Our harmless-error analysis should not focus on the propriety of the trial's outcome—that is, whether the jury verdict was supported by the evidence. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). Instead, we determine the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations—in other words, whether the error adversely affected "the integrity of the process leading to" the conviction. *Id.*; *see also Wesbrook*, 29 S.W.3d at 119 ("[T]he appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence.").

11

We "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [the trial court's] error did not contribute to the conviction or punishment.'" *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting Tex. R. App. P. 44.2(a)). While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. *Wesbrook*, 29 S.W.3d at 119. Other factors to consider may include, if applicable, the nature of the error, the extent that the State emphasized it, its probable collateral implications, and how a juror would probably weigh the error. *Snowden*, 353 S.W.3d at 822. This harmless-error test requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not in the light most favorable to the prosecution. *Balderas v. State*, 517 S.W.3d 756, 810 (Tex. Crim. App. 2016).

## A. The use of the CSLI

The CSLI evidence presented to the jury through Agent Sedwick's testimony was limited to a 14-hour window starting at 3:51 p.m. on the day of the fire and ending the following morning at 5:30 a.m.[9] It was primarily used to show that Appellant was in the area of Gandy's apartment at the time of the fire. According to

---

[9]Although the raw CSLI data was admitted as an exhibit at trial, it was useless outside of Agent Sedwick's interpretive testimony as it consisted of multiple data points and coded cell locations that are not subject to common knowledge. We therefore focus our analysis on Agent Sedwick's testimony interpreting that data.

12

Agent Sedwick, the CSLI showed that Appellant was in the vicinity of Gandy's apartment near the intersection of Lamar and Collins from about 6:00 p.m. to 9:22 p.m.

The court of criminal appeals has recently held that any error in the admission of CSLI evidence was harmless beyond a reasonable doubt when it only "incrementally" improved the jury's reason to believe other evidence presented by the State. *See Dixon*, 2020 WL 220101, at *2. In *Dixon*, a murder-for-hire prosecution, the trial court admitted CSLI for the defendant's location months before the murder in order to show that he met with the hitman and to impeach the defendant's credibility. *Id.* But the court of criminal appeals minimized the importance of the CSLI evidence:

> [Other] properly admitted evidence, which suggested that both men were in Lubbock on the same day, was a significant basis for the jury to disbelieve [the defendant]'s testimony that he was not with [the hitman] in Lubbock. The CSLI from [the defendant]'s phone provided a more specific link between [the defendant's] and [the hitman]'s locations, giving the jury an incrementally greater reason to doubt [the defendant]'s testimony about whether he was with [the hitman] that day, but it was not conclusive—the location data could not rule out the possibility that the two just happened to be in the same general area.

*Id.* The court of criminal appeals also explained that "other evidence . . . seriously undermined [the defendant]'s credibility," and concluded that any evidentiary value attributable to the CSLI was "not a significant pillar of the State's case." *Id.* at *3.

Similarly, the CSLI evidence admitted in this case did not provide the jury anything more than an "incrementally greater reason" to doubt Appellant's statements

13

that he did not go to Gandy's apartment on the night of the fire, that he did not know where her apartment was, and that he did not violently murder Gandy and Asher. Appellant admitted much of what the CSLI revealed about his location the night of the fire in his police interview. He admitted that he knew Gandy lived "off Lamar" and that he was in Arlington, driving up and down Lamar Boulevard near Collins Street, on the night of the fire. He knew where Collins intersected Lamar, and he acknowledged crossing Collins while he drove up and down Lamar between 7 and 10 p.m. He also admitted that he was in Arlington until approximately 10 p.m., when he turned onto Collins from Lamar on his way back to his apartment. Appellant even directly acknowledged that he was close to Gandy's apartment at the time of the fire, saying to Detective Stewart that he understood he was a suspect "[be]cause [he] put [him]self at the scene of the crime or in the area" and "f[e]ll right in the area in the time period that it happened." The CSLI did not firmly establish that Appellant was standing in Gandy's apartment or rule out the possibility that he was simply in the same general area, a fact that he himself admitted. *See id.* ("[T]he location data could not rule out the possibility that the two just happened to be in the same general area.").

Nor was the CSLI evidence the only evidence that seriously undermined Appellant's credibility. Appellant did a good enough job of that on his own. The jury heard evidence that Appellant gave conflicting statements about the source of the strong gasoline smell left in the car he had borrowed from his friend Amanda Rowe

14

and that his explanation of eczema as being the cause of the scratches all over his torso was dubious at best. The jury also had the benefit of the video interview between Appellant and police the day after the fire, from which the jury could have drawn conclusions about his credibility. As the court of criminal appeals concluded in *Dixon*, we conclude in this case that the CSLI evidence was not a "significant pillar" of the State's case. *See Dixon*, 2020 WL 220101, at \*3. This factor therefore strongly weighs in favor of finding any error harmless.

## B. The State's emphasis of the CSLI data

Appellant argues on remand that the State "relied heavily" upon the CSLI data throughout the trial, but this is an overstatement. Agent Sedwick's testimony interpreting the CSLI data comprised only 106 pages of the record—less than 5% of the State's more than 2,200-page case-in-chief. Although the State argued in closing argument that the CSLI evidence showed that Appellant was lying about when he left Volcano's to drive to Arlington, whether he went to Gandy's apartment, and what time he left Arlington and reached his house, the State's discussion of CSLI evidence in closing constituted less than a fifth of the State's entire closing argument. And, as we've mentioned, other evidence undermined his credibility as well. This factor also weighs against finding harm.

## C. The State's overall case

Looking at the record as a whole, the CSLI evidence was a small piece of the State's overall case. The State utilized a substantial amount of other evidence tending to prove Appellant's guilt, including:

- Evidence that Appellant asked friends to lie about where he was on the night of the fire and lied to other people about his whereabouts on that night. *Olivas*, 507 S.W.3d at 471.

- A litany of evidence that Appellant repeatedly lied about his relationship with Gandy, supporting a reasonable inference that he could have been lying about not knowing where she lived and why he sent the last text to her. *Id.* at 471–72 ("[A]ppellant's explanation to police that the reason he had sent the text was because he needed to return Rowe's vehicle reeks of fabrication—Rowe was in Virginia and did not need her vehicle back until later the following day . . . . The reasonable inference from this evidence is that . . . [A]ppellant was in [Gandy]'s apartment and that he attempted to create an alibi by sending the text minutes after he had committed the murders and set the fire.").

- Evidence that the fire was accelerated by the use of gasoline, Appellant's voluntary statements that Rowe's car smelled of gasoline, and Appellant's late-night call to Rowe attempting to explain the gas smell—with a different explanation than he gave police the next day. *See id.* at 472–73.

- Evidence of numerous scratches observed on Appellant's torso the day after the fire, and the medical examiner's testimony that Gandy put up a fight with her assailant. *Id.* at 473. Appellant's attempts to attribute the scratches to eczema were contradicted by multiple witnesses'—including his girlfriend of several years—testimony that they had never known Appellant to suffer from eczema, as well as testimony by the medical examiner that his scratches were not consistent with eczema. *Id.* at 473.

- Evidence that Appellant planned to murder: his notations of "murder" in his Bible and his attempts to obtain an unregistered handgun and silencer. *Id.* at 474.

16

- Evidence that Appellant hated Gandy and resented Asher, which was consistent with the brutal nature of the murders. *Id.* (reciting evidence that Appellant referred to Gandy as "bulldog" and "bitch" and Asher as "that f*****g baby" and "the devil's child," that he always tried to avoid Gandy, that her presence made him agitated and anxious, that his tryst with Gandy caused his relationship with his girlfriend to end, and that Appellant was nearly suicidal after the breakup, which occurred five days before the fire).

- The recorded video interview with Appellant the day after the fire, during which Appellant appeared undisturbed over Asher's painful and violent death. *Cf. Balderas v. State*, 517 S.W.3d 756, 765–66 (Tex. Crim. App. 2016) ("The jury is the sole judge of the credibility and weight to be attached to witness testimony.").

Viewing the record in its entirety, we hold that the CSLI provided only a small part of the evidence establishing that Appellant committed the vicious and heinous murders of Gandy and Asher, an innocent child. *See id.* The jury presumably considered Appellant's admitted presence in the area of the murders, the scratches on his body, the smell of gas in the car, and evidence of his hateful motive for murdering Gandy and Asher, among other evidence, in reaching its verdict.

Therefore, after carefully reviewing the record and performing Rule 44.2(a)'s required harm analysis, we hold beyond a reasonable doubt that the trial court's error did not contribute to his conviction. *See* Tex. R. App. P. 44.2(a). We overrule Appellant's sole issue on remand.

## Conclusion

Having overruled Appellant's sole issue on remand, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 20, 2020